IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALABAMA STATE CONFERENCE          )
OF THE NAACP, *et al.*,           )
                                  )
      Plaintiffs,          )
                                  )
    v.                    )     CASE NO. 2:16-CV-731-WKW
                                  )         [WO]
STATE OF ALABAMA, *et al.*,       )
                                  )
      Defendants.          )

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION & FACTUAL BACKGROUND

The state of Alabama selects appellate judges using at-large elections.  This means that every Alabamian eligible to vote can do so with respect to every seat on the state appellate courts, regardless of residence, as opposed to having their votes limited by geography—as is the case, for example, in the state's legislative elections. In Alabama, African-American voters make up about 26% of the population, yet they rarely are elected to any of the 19 Alabama appellate court seats.  According to Plaintiffs' complaint, only two African-American candidates ever have won an at-large election in the state of Alabama, and both were first appointed by the Governor. No African-American candidate has won an at-large election without a preceding gubernatorial appointment.  (Doc. # 1, at 7.)

Plaintiffs, the Alabama State Conference of the National Association for the Advancement of Colored People ("NAACP") and four black Alabama voters, claim this election practice unfairly dilutes the black vote, which has the effect of denying African-American voters an equal opportunity to participate in the political process, thereby violating Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2"). They bring this claim for declaratory and injunctive relief, asking the court to strike down Alabama's at-large election system for appellate judges and order the state to implement a new election method consisting of single-member districts. Defendants, the State of Alabama and the Alabama Secretary of State John Merrill (in his official capacity), moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (Doc. # 17.) For the reasons set forth below, the motion is due to be denied.

## II.  JURISDICTION & VENUE

The court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action is brought under the VRA. The parties do not contest personal jurisdiction or venue.

## III.  STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A "claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the standard does not require "detailed factual allegations," a complaint will not survive by tendering "naked assertion[s] devoid of further factual enhancement" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (quoting *Twombly*, 550 U.S. at 555) (quotation marks omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

## IV. DISCUSSION

Section 2 of the VRA "outlaws election practices that result in racial discrimination."[1] *Nipper v. Smith*, 39 F.3d 1494, 1509–10 (11th Cir. 1994). One way an election practice may violate Section 2 is by diluting the vote of minority groups. *See Thornburg v. Gingles*, 478 U.S. 30, 48–51 (1986) (discussing at length Section 2 claims based on vote dilution); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969) ("The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot."). State judicial

---

[1] The statute prohibits the imposition of a "voting qualification or prerequisite to voting or standard, practice or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of his race or color." 52 U.S.C. § 10301(a).

elections fall within the ambit of Section 2.  *Chisom v. Roemer*, 501 U.S. 380, 404 (1991).

To establish a vote dilution claim under Section 2, plaintiffs challenging an at-large election system on behalf of a protected class of citizens must show that (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group is "politically cohesive," and (3) the majority group "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 49–51. In the Eleventh Circuit, satisfaction of the first factor also requires showing "the existence of a proper remedy."  *Davis v. Chiles*, 139 F.3d 1414, 1419 (11th Cir. 1998) (noting in footnote 14 that "[o]ur *en banc* court established this principle as part of our Section Two jurisprudence in our interpretation of the first *Gingles* factor in *Nipper*"); *see Nipper*, 39 F.3d at 1530–31 (holding that the first *Gingles* factor "dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases").

The *Gingles* factors, however, represent only the preconditions for demonstrating vote dilution—they are "necessary, but not always sufficient, to establish a claim for relief."  *Nipper*, 39 F.3d at 1512.  The other half of the analysis is heavily dependent on the facts of the case.  *See Johnson v. De Grandy*, 512 U.S. 997, 1020–21 (1994) ("No single statistic provides courts with a shortcut to

determine whether [an election structure] unlawfully dilutes minority voting strength."); *Nipper*, 39 F.3d at 1498 (declaring that Section 2 vote dilution cases "are inherently fact-intensive"); *id.* at 1527 ("Courts evaluating vote dilution claims . . . must consider all relevant evidence."). Once the factors are met, Section 2 demands the court inquire whether, "under the totality of the circumstances," the members of the minority group "possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters."[2] *Id.* at 1512 (quoting *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993)); *see also Chisom*, 501 U.S. at 399 (1991) (rejecting the argument that the word "representative" in Section 2 excluded elected judges). Such an inquiry necessitates a "comprehensive, not limited, canvassing of relevant facts." *Johnson*, 512 U.S. at 1011.

Defendants' motion to dismiss attacks Plaintiffs' Section 2 claim on three fronts. First, Defendants argue Plaintiffs have failed to suggest a proper remedy for

---

[2] Section 2(b), 52 U.S.C. § 10301(b), in full, provides:

A violation of [Section 2(a)] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

the alleged vote dilution. In so doing, they skip over the traditional *Gingles* factors and go straight to this circuit's remedy requirement, claiming that prior Eleventh Circuit case law forecloses subdistricting as a possible solution. Second, Defendants maintain that the totality of the circumstances approach set forth in *Gingles* compels this court to hold that the State's interest in maintaining its current electoral system outweighs whatever vote dilution Plaintiffs might prove. Third, Defendants contend that, even if Plaintiffs put forth a prima facie case of Section 2 vote dilution, their lack of standing and the state's sovereign immunity bar Plaintiffs' claims. The court addresses each of these arguments in turn.

## A.     Remedy

### 1.     *Plaintiffs must allege a facially plausible remedy.*

Plaintiffs protest that at this stage they need only establish the three traditional *Gingles* factors, without any remedy averment. (Doc. # 34, at 7.) This is perhaps the case in other circuits, but not here. The Eleventh Circuit in *Nipper* explicitly held that "the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases," 39 F.3d at 1530–31, and in the process of coming to that decision, it repeatedly emphasized the "threshold nature of the *Gingles* factors," *id.* at 1512 (referring eleven times to the "*Gingles* threshold factors"). It is impossible to reconcile this language with Plaintiffs' statement of the law, which would have the court ignore the remedy requirement until some later procedural moment. In

defending a Section 2 claim against a motion to dismiss, Plaintiffs must allege a plausible remedy. However, the burden at this stage is far from onerous. In alleging a remedy capable of surviving a motion to dismiss, as with any other sort of allegation at this stage, Plaintiffs need only demonstrate facial plausibility. *Iqbal*, 556 U.S. at 678.

## 2. *Subdistricting is a facially plausible remedy at this stage.*

Defendants contend Plaintiffs have failed to plead a facially plausible remedy because binding Eleventh Circuit authority forecloses their suggested remedy—subdistricting—as a viable option. They point to four cases for this proposition: *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994); *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) ("*SCLC*"); *White v. Alabama*, 74 F.3d 1058 (11th Cir. 1996); and *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998). Although these cases highlighted the flaws of subdistricting as a potential judicial remedy, three (*Nipper*, *SCLC*, and *Davis*) do so exclusively in cases involving the election of trial judges, and the other (*White*) did not reach the issue.[3] No Eleventh Circuit case has yet rejected subdistricting as a remedy for vote dilution in *appellate* judicial elections. This distinction may turn out to be

---

[3] The *White* court, in dicta, does refer to single-member subdistricting as "the traditional vote dilution remedy," 74 F.3d at 1066, but it does so in a passing reference accompanied by no analysis or explanation. Though worth mentioning, the phrase is afforded little weight in the court's analysis here.

immaterial in the end, and it may be that the court determines down the road that subdistricting is not a viable remedy in appellate judicial elections, as the Eleventh Circuit has decided in the election of Alabama's trial judges. But at this pre-discovery stage of the litigation, the trial/appellate distinction appears capable of changing the outcome of the case, and it therefore counsels against a potentially premature dismissal.

The cases bear out this conclusion. *Nipper* and *SCLC* involved challenges to the at-large judicial election systems in Florida and Alabama, respectively. In both cases, the *en banc* Eleventh Circuit rejected subdistricting as a remedy for Section 2 vote dilution. However, the reasoning in *Nipper*, on which the *SCLC* court heavily relies, appears to limit the holding (at least implicitly) to cases challenging the election of trial judges. For one, *Nipper* included a footnote clarifying that the issue in that case "concern[ed] the election of trial court judges, not the members of a multimember appellate court," and added the caveat that "there might be more to be said for some form of 'representation' on a collegial court (like a state supreme court) than on a single-judge trial court." *Nipper*, 39 F.3d at 1535 n.78 (mentioning also the relevance of "bring[ing] diverse perspectives to the court" in the appellate context).[4] This language demonstrates, at the very least, that the *Nipper* court did

---

[4] That footnote elaborates on how the differences between the elections of legislators and trial judges justify a different Section 2 analysis. Focusing on whether the "circumstantial evidence factors referred to in *Gingles*" are appropriate in the judicial election context, the court

not take it as a given that challenges to appellate court elections would be in all regards the same as challenges to trial court elections.

The rest of the *Nipper* opinion is consistent with that reading. The reasons for which the Eleventh Circuit rejected subdistricting in the context of a trial court election might not apply with the same force to appellate court elections. For example, although the court took issue with the way subdistricting would further dilute the minority influence in all but the contrived minority districts, it also recognized that "the concern is more pronounced here [than in the elections of collegial bodies] because trial court judges act alone in exercising their power." *Id.* at 1543. The court reasoned that subdistricting would "eliminate the minority voters' electoral influence over" trial judges outside their subdistrict, while "[i]n the case of collegial bodies [with subdistrict elections], all citizens continue to elect at least one person involved in the decisionmaking process and are, therefore, guaranteed a voice in most decisions." *Id.* at 1543–44.

Although the Eleventh Circuit specifically referred to "collegial bodies" in the "legislative context," *id.* at 1543, it noted elsewhere in the opinion that an appellate court comprises individual judges who "decide[ ] cases as a group," *id.* at 1535 n.78,

_____

in dicta notes the analytical differences between trial and appellate courts. *Nipper*, 39 F.3d at 1535 n.78. Although the election of appellate judges was not before the court in *Nipper*, the logic of the decision (including the footnote highlighted here) supports the conclusion that other considerations could prevail in a challenge involving appellate judicial elections—or, at the very least, that these considerations deserve a closer look on a developed factual record.

as opposed to trial judges who "conduct their decisionmaking process independently," *id.* at 1544. This distinction should not be ignored. *Nipper*'s language acknowledges the possibility that, for purposes of fashioning a Section 2 remedy, Alabama appellate courts should be viewed as more akin to legislatures than to Alabama trial courts. But the merits of that analogy and its potential effects on the court's remedy considerations are issues that would benefit from full briefing on a developed factual record. *Nipper* and *SCLC* both were decided after bench trials, not on the allegations at the Rule 12(b)(6) juncture. Thus, far from being perfect analogues to the case at bar, *Nipper* and *SCLC* together counsel against rote application of their holdings, first, by recognizing that trial and appellate judicial elections may not be analytically identical, and second, by demonstrating the amount of factual detail required to make Section 2 determinations.

*White* and *Davis* are equally dissimilar. Although *White* involved a challenge to Alabama's appellate judicial elections, the opinion is little help here because the Eleventh Circuit in *White* did not analyze whether subdistricting could be ordered as a remedy for a Section 2 violation. *White* considered and rejected a different remedy altogether.[5] Defendants argue that *White* illustrates the Eleventh Circuit's hesitancy

_____

[5] The district court found that the settlement agreement under scrutiny in *White* upheld the state's "interest in ensuring that voters have the opportunity to vote for all appellate judges" better than single-member districts would. *White v. State of Alabama*, 867 F. Supp. 1519, 1546 (M.D. Ala. 1994), *vacated*, 74 F.3d 1058 (11th Cir. 1996). Because the district court found that the parties settlement agreement embodied a remedy that was "at least as good for African-Americans as any alternative remedy," *id.* at 1535, it did not have to decide whether single-member districts

to sanction any court-imposed restructuring of a state judicial election system, and thus weighs in favor of dismissal here. (Doc. # 17, at 26.) However, Defendants' conclusion does not follow the premise. It may be that *White*, to some degree, forecasts what the Circuit might say were it presented with the question now before this court—namely, whether subdistricting is a viable remedy for Section 2 vote dilution in the context of *appellate* judicial elections. But the judicial prerogative involves applying precedent, not making predictions. Because the Eleventh Circuit has yet to address the question directly, this court is left to travel on reason and other more distant precedent. Moreover, the stated reason for which the proposed remedy in *White* failed was because "federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies." 74 F.3d at 1072 (quoting *Nipper*, 39 F.3d at 1532). Subdistricting does not necessarily involve an alteration of the size of the elected body, and thus *White* does not squarely prohibit it. The court declines to extend *White*'s holding to prohibit remedies that it did not purport to preclude.

*Davis* also did not change the Section 2 landscape in any significant way. As in *Nipper* and *SCLC*, after a bench trial, the court in *Davis* considered challenges to

---

would have been an appropriate Section 2 remedy in the case before it, *see id.* at 1536. On appeal, the Eleventh Circuit noted the arguments for a remedy replacing the at-large election system with single-member districts, *see*, *e.g.*, *White*, 74 F.3d at 1065, but it rejected the settlement agreement's remedy on grounds unrelated to those arguments.

the at-large elections of trial judges, this time in several Florida districts that had

gone unchallenged in *Nipper*. Despite expressing qualms about the Circuit's Section

2 precedent, the panel in *Davis* faithfully applied *Nipper* and *SCLC*, recognizing that

*Davis* presented the same question decided in those cases and holding that

subdistricting is not a viable remedy in Section 2 challenges to trial court elections.[6]

*Davis*, 139 F.3d at 1423. The court once again did not consider whether the rule

applies in the case of appellate judicial elections.

Of course, it would be remiss to pretend *Nipper* and its offspring contain no

countervailing considerations whatsoever—they contain several. To the extent

subdistricting would "foster the idea that judges should be responsive to

constituents" and limit the "pool of candidates" who might consider running for

judicial office, *Nipper*, 39 F.3d at 1544–46, its effect on appellate court elections

---

[6] As Defendants point out (Doc. # 17, at 27), the court expressed its disagreement with the *en banc* decision in *Nipper*, going so far as to opine that "in this circuit, Section Two of the Voting Rights Act frankly cannot be said to apply, in any meaningful way, to at-large judicial elections." *Davis*, 139 F.3d at 1424. This is dicta, and it represents the opinion of a panel that appears to be begrudgingly applying law with which it disagrees. There is little doubt that the *en banc* court that voted for *Nipper* would disagree with the *Davis* panel's characterization of that decision, which includes the remark that *Nipper* "appears to conflict with the Supreme Court's initial pronouncements on this subject in *Chisom* and *Houston Lawyers*." *See Davis*, 139 F.3d at 1424. Thus, when Defendants use *Davis*'s sweeping language to argue that subdistricting can *never* be appropriate in a challenge to any at-large judicial election (Doc. # 17, at 27–28), the court reads it with a grain of salt. In the broader precedential context, and with the knowledge that the *Davis* panel expressly disagreed with controlling law on this topic, it is difficult to reach Defendants' conclusion. *Davis* involved a straightforward application of existing law, with no factual variation. It did not consider whether subdistricting could be used to remedy vote dilution in an *appellate* judicial elections case, and Defendants point to no other case that does. Extrapolating to reach the conclusion for which Defendants argue would be inconsistent with binding authority on this topic.

would not differ much from its effect on trial court elections. Defendants list several additional ways in which subdistricting for trial and appellate judicial elections would undermine similar state interests. (Doc. # 17, at 31–40 (respect for a state's constitutional model; allowing voters to have a voice on the entire court; preventing the marginalization of minority voters; judicial independence; ensuring a large pool of candidates).) In this sense, the cases on trial court elections are somewhat comparable. But, in view of the differences between trial and appellate courts, as recounted above, Defendants have not shown that these similarities justify the far-reaching conclusion that subdistricting can *never* be a viable remedy in a Section 2 case involving judicial elections. Indeed, no case ever has held as much. Defendants' argument also reaffirms that the question of an appropriate remedy requires a fact-intensive balancing, which is not generally suitable on a motion to dismiss. *See Davis*, 139 F.3d at 1419–20 ("In assessing a plaintiff's proposed remedy, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan.").

Defendants may very well prove that subdistricting cannot work in this context. But dismissing Plaintiffs' case, without giving them a chance to conduct discovery and adduce evidence, would require the authority of nothing less than a spotted-dog case. Because no such case exists, the court cannot conclude, as a matter

of law, that subdistricting *never* can be employed as a remedy in a vote dilution challenge to a state system of appellate judicial elections. By suggesting subdistricting as a potential remedy, Plaintiffs have satisfied their pleading burden.

**B.    Totality of the Circumstances**

Defendants next argue that the second step of the *Gingles* analysis—the totality-of-the-circumstances prong—compels dismissal. This is because "the State's interest in its current electoral system is so strong, it outweighs any alleged vote dilution." (Doc. # 17, at 44.) Defendants appear to argue that the degree to which Alabama's electoral system may have diluted the black vote is irrelevant because, no matter how extreme the vote dilution, the interest of minority citizens to participate in the democratic process can never outweigh the state's interest in maintaining the status quo. Defendants' argument is untenable.

First, Defendants' interpretation of the law would remove from the reach of Section 2 all cases of alleged vote dilution. If the state's interest is as strong as Defendants suggest, then how could a Section 2 individual plaintiff ever prevail on a claim for vote dilution? Yet, vote dilution claims have been cognizable under Section 2 for over three decades. *See Gingles*, 478 U.S. at 48–51 (discussing Section 2 claims based on vote dilution brought by black registered voters in North Carolina); *see also Allen*, 393 U.S. at 569 ("The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot.").

And, at least since *Chisom*, state judicial elections have been subject to Section 2 review. 501 U.S. at 404. There is no case suggesting that a Section 2 vote dilution claim can never succeed in a challenge to a state judicial election at the appellate level. Holding as much would eviscerate Section 2 in the judicial election context.

Second, the totality-of-the-circumstances analysis requires the court to consider evidence that is not available at this stage in the litigation. As the Supreme Court made clear in *Johnson*, the inquiry must involve a "comprehensive, not limited, canvassing of relevant facts." 512 U.S. at 1011. Vote dilution cases brought under Section 2 are "inherently fact-intensive," *Nipper*, 39 F.3d at 1498, and thus courts evaluating them "must consider all relevant evidence," *id.* at 1527. "[U]nder [*Johnson*], reviewing courts are required—not just invited—to look beyond the *Gingles* threshold factors when evaluating vote dilution claims." *Id.* at 1513. But in reviewing a motion to dismiss the court can only look so far. The parties here have conducted no discovery and developed no significant evidentiary record. Yet, Defendants ask for a favorable ruling based on the "totality of the circumstances," an impossible task. It is no surprise that "the three cases most heavily relied on by Defendants were decided after lengthy bench trials and based on extensive evidentiary records." (Doc. # 34, at 7.) Accordingly, the motion to dismiss cannot be granted on this ground.

## C.   <u>Standing & Sovereign Immunity</u>

### 1.   *Plaintiffs have standing to sue.*

Defendants' standing arguments are also meritless. To establish standing, a plaintiff must allege an actual or imminent "injury in fact" that was caused by the conduct complained of and is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Aside from recycling the remedy argument dealt with in a prior section of this opinion, Defendants only challenge Plaintiffs' statement of injury.

### a.   **Individual Plaintiffs**

Defendants contend that Plaintiffs lack standing because the Complaint fails to "identify particular judicial candidates of their *personal* choice whom they were unable to elect on account of race, or [fails to allege] that they personally have suffered vote dilution because the challenged courts' members are elected statewide." (Doc. # 17, at 49.) But Plaintiffs need not identify specific losing candidates in order to have standing. *See Gray v. Sanders*, 372 U.S. 368, 375 (1963) (holding that "any person whose right to vote is impaired . . . has standing to sue"); *Baker v. Carr*, 369 U.S. 186, 206 (1962) (holding that "voters who allege facts showing disadvantage to themselves as individuals have standing to sue"). And they have already alleged a personal injury. In the Complaint, Plaintiffs allege (1) that they are residents of Perry, Jefferson, Tuscaloosa, and Lee counties (Doc. # 1, at 4),

and (2) that they are registered voters and members of a protected class whose electoral strength has been diluted by Alabama's structure of appellate judicial elections (Doc. # 1, at 4, 13–14). These allegations are enough to establish standing and proceed past the motion to dismiss stage. *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (holding that even a "small injury" hindering a person's ability to vote "is sufficient to confer standing").

### b.    Alabama NAACP

Defendants also argue that the Alabama NAACP lacks organizational standing. An organization may sue on behalf of its members if: (1) they "would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Defendants, rather than arguing the point, assert that "[t]he Complaint is simply silent on these issues."

Defendants' assertion is a head-scratcher. As demonstrated in the previous section, the individual plaintiffs have "standing to sue in their own right"—thus, the first prong is satisfied. As for the second prong, the Complaint goes into some detail

about how the interests of the Alabama NAACP involve working "to ensure the political, educational, social, and economic equality of African Americans," "to eliminate racial discrimination in the democratic process," and "to enforce federal laws and constitutional provisions securing voting rights." (Doc. # 1, at 3.) It even describes specific ways in which the Alabama NAACP encourages African Americans to get out to vote. (Doc. # 1, at 3.) Accordingly, the court finds that "the interests at stake are germane to the organization's purpose," and thus the second prong is satisfied. Finally, the claim here does not require "the participation of individual members in the lawsuit" because the claim is for "prospective or injunctive relief." *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996) (holding that "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members").

### 2. *The State of Alabama is not immune.*

The State of Alabama argues that the Eleventh Amendment immunizes it from suit by private plaintiffs under the VRA.[7] (Doc. # 17, at 50–51.) Generally speaking, the Eleventh Amendment prevents nonconsenting states and state actors from being

---

[7] There is no question that the Attorney General may sue on behalf of voters under the enforcement provision of the VRA, and it is clear that other state defendants may be sued for prospective, injunctive relief under *Ex Parte Young*, 209 U.S. 123 (1908). Because the Secretary of State has been named, the suit will proceed regardless of the outcome of this discussion. The sole question here is whether the State of Alabama may be sued by a private litigant under Section 2 of the VRA.

sued by private individuals in federal court. *See McLendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001). However, even where a state has not waived its immunity, "Congress can abrogate [it] by enacting legislation to enforce the substantive provisions of the Fourteenth Amendment." *Id.* at 1298. The question here, therefore, is whether Section 2 of the VRA abrogates Alabama's sovereign immunity in actions brought by private plaintiffs.[8]

Congress is said to have abrogated the sovereign immunity of a state if it has (1) "unequivocally expresse[d] its intent" to do so, and (2) has acted "pursuant to a valid exercise of power." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Dealing first with the second prong, courts have long recognized Section 2 as a valid exercise of Congress's power to enforce the Fourteenth and Fifteenth Amendments. *See City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("We have also concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States.") (citing *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), which upheld several provisions of the VRA); *United States v. Board of Comm'rs of*

---

[8] An assertion of Eleventh Amendment immunity challenges a court's subject-matter jurisdiction. A challenge to subject-matter jurisdiction implicates Rule 12(b)(1), not Rule 12(b)(6), of the Federal Rules of Civil Procedure. *See McElmurray v. Consol. Gov't of Augusta–Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). On a Rule 12(b)(1) facial attack, the court evaluates whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction" in the complaint and employs standards similar to those governing Rule 12(b)(6) review. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–36 (11th Cir. 2013).

*Sheffield, Ala.*, 435 U.S. 110, 126–27 (1978) ("The [VRA], of course, is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment."); *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1556 (11th Cir. 1984) ("Congress [in enacting Section 2] . . . relied not on any independent power to interpret the Constitution but rather on congressional power to *enforce* the Civil War Amendments."). Thus, the only remaining issue is whether Congress's intent to abrogate state sovereign immunity unequivocally was expressed in the VRA.

The standard for finding a valid abrogation is "stringent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56 (1996). But here, it is difficult to conceive of any reasonable interpretation of Section 2 that does not involve abrogation of the state's immunity. The statute explicitly forbids "*any State*" from imposing a "voting qualification or prerequisite," or a "standard, practice or procedure," that "results in a denial or abridgement of the right of any citizen of the United States to vote" because of their "race or color." 52 U.S.C. § 10301 (emphasis added). Such a restriction on state action would be toothless without the right to sue for a remedy. And the right of private litigants to bring such an action under Section 2 "has been clearly intended by Congress since 1965." *See Morse v. Republican Party*, 517 U.S. 186, 240 (1996) (Breyer, J., concurring) (quoting S. REP. NO. 97-417, at 30 (1982)). With two principles in mind—first, that the statute purports to limit the conduct of

states and, second, that private litigants have the right to sue for a remedy—one wonders how Section 2 plausibly could function if private litigants were barred from suing states.[9]

---

[9] A related question is whether private litigants may sue at all. One argument, which Defendants briefly raise (Doc. # 17, at 51–52), is that the statute could function just fine if its enforcement were restricted to actions brought by the Attorney General, which are expressly authorized in the VRA's enforcement provision, 52 U.S.C. § 10308(d). *See, e.g., Allen v. State Bd. of Elections*, 393 U.S. 544, 556 n.20 (1969) ("Appellees argue that [§] 5 only conferred a new 'remedy' on the Attorney General of the United States."); *Gray v. Main*, 291 F. Supp. 998, 1000 (M.D. Ala. 1966) ("The argument of the defendants that actions by private individuals are not authorized . . . is not persuasive."). But in *Allen* the Supreme Court explained the error in this rationale:

> The [VRA] was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens. Congress realized that existing remedies were inadequate to accomplish this purpose and drafted an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws.
>
> The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. For example, the provisions of the Act extend to States and the subdivisions thereof. The Attorney General has a limited staff and often might be unable to uncover quickly new regulations and enactments passed at the varying levels of state government. It is consistent with the broad purpose of the Act to allow the individual citizen standing to insure that his city or county government complies with the [§] 5 approval requirements.

393 U.S. at 556–57 (citations and footnotes omitted); *see id.* at 556 n.21 (noting also that "it was the inadequacy of [private suits under the Fifteenth Amendment] for securing the right to vote that prompted Congress to pass the Voting Rights Act"). The court is also aware that the Supreme Court since *Allen* has tightened the standard for implying a private right of action. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855–56 (2017) (noting after a discussion of *Allen* that later "the arguments for recognizing implied causes of action for damages began to lose their force"). For two reasons, the court is unpersuaded that this precludes the action brought by Plaintiffs here. First, this action is not for damages; it is for injunctive relief. And the *Ziglar* court was much more concerned with the former. *See id.* at 1856 ("[I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action *for damages* against federal officials in order to remedy a constitutional violation.") (emphasis added). And second, the Supreme Court's hesitance in *Ziglar* was against extending implied rights of action and creating new rights, not against continuing to enforce long-

It is therefore unsurprising that the only circuit to rule on this issue directly, to the court's knowledge, held that Section 2 abrogates state sovereign immunity. *See Mixon v. State of Ohio*, 193 F.3d 389 (6th Cir. 1999). One issue faced by the Sixth Circuit in *Mixon* was that the VRA is arguably an exercise of Congress's authority to enforce the Fifteenth Amendment, not the Fourteenth, which places it on considerably shakier ground in the abrogation-of-sovereign-immunity sphere.[10] However, relying on two Supreme Court decisions, *City of Rome v. United States*, 446 U.S. 156 (1980), *abrogated on other grounds in Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), and *City of Boerne v. Flores*, 521 U.S. 507 (1997), the court held that, because the enforcement provision of the Fifteenth Amendment is identical to the one in the Fourteenth Amendment, "Congress may abrogate sovereign immunity by passing legislation under the Fifteenth Amendment." *Mixon*, 193 F.3d at 399.

The Sixth Circuit's reading of *City of Rome* is persuasive. In that case, the Supreme Court held that

> principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments "by appropriate legislation." [*See*,

---

established rights of action. With no binding authority denying a right of action under Section 2, and with the history of aforementioned cases suggesting the opposite, the court remains unconvinced that *Ziglar*'s mandate would prevent Plaintiffs in this case from bringing suit under Section 2.

[10] Although it is clear that Congress can abrogate state sovereign immunity through the enforcement provision of the Fourteenth Amendment, the Supreme Court has never expressly held that Congress may abrogate it through Section 2 (the enforcement provision) of the Fifteenth Amendment, even though the respective provisions are identically phrased.

> *e.g.,* U.S. CONST. AMEND. XIV, § 5; U.S. CONST. AMEND. XV, § 2.]
> Those Amendments were specifically designed as an expansion of
> federal power and an intrusion on state sovereignty. Applying this
> principle, we hold that Congress had the authority to regulate state and
> local voting through the provisions of the Voting Rights Act.

*City of Rome*, 446 U.S. at 179–80. *But see Lewis v. Bentley*, No. 16cv690, 2017 WL

432464 (N.D. Ala. 2017) (finding *Mixon* unpersuasive), *appeal docketed*, No. 17-

11009 (11th Cir. March 3, 2017). Grouping together the enforcement provisions of

the Fourteenth and Fifteenth Amendments, and calling both "an intrusion on state

sovereignty," the Supreme Court came just shy of expressly holding that Congress

may abrogate state sovereign immunity through both. The Sixth Circuit took the

high court at its word, and so does this court. Thus, whether the VRA derives its

power from the Fourteenth or the Fifteenth Amendment does not matter, because the

Supreme Court confirmed, at least implicitly, Congress's authority to abrogate state

sovereignty "by appropriate legislation." This language, combined with the

foregoing discussion of Section 2, persuades the court that states may not hide

behind the Eleventh Amendment in defending themselves in suits by private

plaintiffs for alleged violations of the VRA. Accordingly, the State of Alabama is

not immune from this Section 2 suit.

## V.  CONCLUSION

Accordingly, it is ORDERED that Defendants' Motion to Dismiss (Doc. # 17) is DENIED.  It is further ORDERED that Defendants shall file an answer to the Complaint on or before **September 14, 2017**.

DONE this 31st day of August, 2017.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE