IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE N.A.A.C.P., *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No.:<br>) 2:16-CV-731-WKW<br>) |
| THE STATE OF ALABAMA, *et al.*, | )<br>)<br>) |
| Defendants. | ) |

## AMENDED COMPLAINT

1. The Supreme Court of Alabama is the highest court in the State. The Alabama Court of Criminal Appeals and the Alabama Court of Civil Appeals are the State's two intermediate appellate courts. Together, the three courts render enormously consequential decisions that profoundly affect the lives of all Alabamians.

2. Today, all nineteen judges on these three courts are white. Approximately one-quarter of Alabama's population is African-American. African Americans have been prevented from participating fully in the election of Alabama's appellate judges because of the way those judges are elected. That election method, in which all judges for all three courts are elected in at-large statewide elections, unlawfully dilutes the voting strength of African Americans and prevents them from electing candidates of their choice.

3. Voting in Alabama is racially polarized: white voters as a group and African-American voters as a group consistently prefer different candidates. As a result, the at-large

1

method of election deprives one-quarter of the State's voting-age population of the chance to elect judges of their choice to *any* of the nineteen seats on the three courts.

4. No African American has won an election to any of the three courts in the past twenty-one years and no African American has served on these courts for the past fifteen years.

5. Alabama's African-American population and its voting-age population are sufficiently large and geographically compact to constitute a majority in at least one fairly drawn, constitutional single-member district for both nine-district and five-district plans; the State's African Americans are politically cohesive; and the State's white voting-age majority votes sufficiently as a bloc to enable it usually to defeat African-American voters' preferred candidates. Because of these circumstances, as well as the historical, socioeconomic, and electoral conditions of Alabama, the at-large election method for the Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2"). *Thornburg v. Gingles*, 478 U.S. 30 (1986).

6. For these reasons, plaintiffs request this Court to declare that the use of at-large elections for the Supreme Court of Alabama, the Alabama Court of Criminal Appeals, and the Alabama Court of Civil Appeals violates Section 2 of the Voting Rights Act, to enjoin the further use of at-large elections for these courts, and to require future elections for these courts to be conducted under a method of election that complies with the Constitution of the United States and the Voting Rights Act.

## JURISDICTION

7. This Court has jurisdiction over this action pursuant to (1) 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act; and (2) 28 U.S.C. § 1331, because this action arises under the laws of the United States.

8. This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

9. This Court has personal jurisdiction over the Defendants.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

**The Plaintiffs**

11. Plaintiff ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("Alabama NAACP") is – a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate African-American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day.

12. Plaintiff SHERMAN NORFLEET is an adult African-American United States citizen who is a resident of and a registered voter in Perry County, Alabama.

13. Plaintiff CLARENCE MUHAMMAD is an adult African-American United States citizen who is a resident of and a registered voter in Jefferson County, Alabama.

14. Plaintiff CURTIS TRAVIS is an adult African-American United States citizen who is a resident of and a registered voter in Tuscaloosa County, Alabama.

15. Plaintiff JOHN HARRIS is an adult African-American United States citizen who is a resident of and a registered voter in Lee County, Alabama.

**The Defendants**

16. Defendant STATE OF ALABAMA is one of the fifty states comprising the United States of America.

17. Defendant JOHN H. MERRILL is the Secretary of State of Alabama and is sued in his official capacity. The Secretary of State is the State's chief election officer. Ala. Code § 17-1-3(a).

## FACTS AND BACKGROUND

18. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [a protected minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b). An electoral regime that dilutes the voting strength of a minority community may deprive the members of that community of

having an equal opportunity to elect representatives of their choice under Section 2. Section 2 applies to the election of judges. *Chisom v. Roemer*, 501 U.S. 380 (1991).

19. The Alabama Supreme Court is the court of last resort in Alabama. The chief justice and eight associate justices of the Supreme Court are elected at large to six-year, staggered terms. The chief justice is elected to a designated position and the remaining justices are elected to numbered places that have no functional significance.

20. The Alabama Court of Criminal Appeals and the Alabama Court of Civil Appeals have five judges each. They are the intermediate appellate courts for criminal and civil claims, respectively. The judges for these courts are also elected at large to six-year, staggered terms. Judges of the Court of Criminal Appeals elect the presiding judge, while the most senior judge on the Court of Civil Appeals serves as the presiding judge. The ten intermediate appellate judges are elected to numbered places that have no functional significance.

21. Elections for the Alabama Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals are partisan, and primary elections are held to determine which candidates advance to the general election. Primary elections must be won with a majority of the vote; if no candidate receives a majority, there is a runoff between the top two vote-getters.

22. When vacancies arise on any of the three courts, the governor appoints a replacement, who serves for a limited time before he or she must stand for election.

23. The at-large method of electing judges to the three high courts submerges African-American voters so that they are rendered ineffective electoral minorities in every election.

24. The at-large method of election violates Section 2 of the Voting Rights Act because it denies Alabama's African-American voters an equal opportunity to participate in the political process and to elect judges of their choice.

**Alabama Demographics**

25. As of the 2010 Census, Alabama had a total population of 4,779,736. U.S. Census Bureau, *Alabama: 2010*, http://www.census.gov/quickfacts/table/PST045215/01. The State has the sixth-highest percentage of African Americans in the country, who comprised 26.0 percent of the total population in 2000 and 26.2 percent in 2010. *Id.;* U.S. Census Bureau, *Alabama: 2000*, http://www.census.gov/prod/2002pubs/c2kprof00-al.pdf. Over the same time period, the white total population percentage declined marginally from 71.1 percent in 2000 to 68.5 percent in 2010.

26. Alabama's African-American voting-age percentage is slightly lower than its percentage of the State's total population. According to the 2010 U.S. Census, the African-American voting-age population amounts to 24.7 percent. Alabama's white voting-age population is 69.4 percent. U.S. Census Bureau, *2010 Census Redistricting Data*, Public Law 94-171, Summary File, *Hispanic or Latino, and Not Hispanic or Latino by Race for the Population 18 Years and Over*, tbl. P4.

27. The African-American population is largely concentrated in Jefferson County and in "Black Belt" counties which run from the Mississippi border to the Georgia border across the south-central region of Alabama.

28. The population and the racial demographics for Alabama, which are the basis for plaintiffs' proposed alternative redistricting plans, are as follows:

## Table 1 – Alabama Population by Race

|  | Total Population – 2010 Census | | Voting-age Population – 2010 Census | |
|---|---|---|---|---|
| White alone | 3,275,394 | 68.5% | 2,530,761 | 69.4% |
| African American alone | 1,251,311 | 26.2% | 902,278 | 24.7% |
| Other | 252,031 | 5.3% | 214,238 | 5.9% |
| **Total** | **4,779,736** | | **3,647,277** | |

**Alabama Appellate Courts Election History**

29. Only two African Americans have been elected to statewide office in the history of Alabama.

30. No African-American candidate has ever won election to statewide office without first being appointed by the governor.

31. Oscar Adams, an African American, was appointed by the governor to the Alabama Supreme Court in 1980. He won re-election in 1982 and 1988.

32. Justice Adams retired in 1993, and the governor appointed an African American, Ralph Cook, to replace him. Justice Cook was elected to a full term in 1994.

33. John England, Jr., an African American, was appointed to the Alabama Supreme Court in 1999.

34. Justices Cook and England were defeated by white challengers when they stood for re-election in 2000.

35. Since 1994, every African American that has run for any of the three appellate courts has been defeated by a white candidate.

36. An African American has never served on either the Court of Criminal Appeals or the Court of Civil Appeals.

37. From 2000 to present, four African-American candidates ran for the Supreme Court, four African-American candidates ran for the Court of Criminal Appeals, and one

African-American candidate ran for the Court of Civil Appeals. All were defeated by white candidates.

38. All nineteen of the current appellate judges in Alabama are white.

39. A statistical analysis demonstrates that voting patterns in Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals elections are racially polarized, with African-American voters consistently voting for a particular (usually African-American) candidate of choice. White bloc voting in support of their preferred candidates has repeatedly led to the defeat of candidates preferred by African-American voters.

**Section 2 Vote Dilution and *Thornburg v. Gingles***

40. The United States Supreme Court, in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act:

   (1) The minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district";

   (2) The minority group must be "politically cohesive"; and

   (3) The majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

41. Alabama's African-American population and voting-age population are sufficiently numerous and geographically compact to form a majority of the total population and

voting-age population in at least one properly-apportioned, constitutional single-member Supreme Court district in a nine-district plan.

42. Alternatively, Alabama's African-American population and voting-age population are sufficiently numerous and geographically compact to form a majority of the total population and voting-age population in at least one properly-apportioned, constitutional single-member Supreme Court district in an eight-district plan.

43. Alabama's African-American population and voting-age population are sufficiently numerous and geographically compact to form a majority of the total population and voting-age population in at least one properly-apportioned, constitutional single-member Court of Criminal Appeals/Court of Civil Appeals district in a five-district plan.

44. Alabama's African-American voters are politically cohesive. They vote overwhelmingly for different candidates than those supported by white voters.

45. Alabama's white electorate votes as a bloc in support of different candidates than those supported by African-American voters. Bloc voting by white members of the electorate consistently defeats the candidates preferred by African-American voters.

**Section 2's Totality of the Circumstances Analysis**

46. In addition to the presence of the three *Gingles* preconditions, the totality of the circumstances shows that African-American voters have less opportunity than other members of the electorate to participate in the political process and to elect candidates of their choice to the Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals in violation of Section 2 of the Voting Rights Act.

47. The history of state-sponsored voting discrimination in Alabama is well documented. At different points in its history, Alabama utilized poll taxes, literacy tests, and

9

discriminatory redistricting methods to restrict African Americans' access to the franchise. A brutal attack on peaceful voting rights marchers at the Edmund Pettus Bridge in Selma, Alabama, on March 7, 1965, moved President Lyndon Johnson to propose the Voting Rights Act eight days later and to sign the Act just five months later.

48. On May 28, 1986, a federal district court found that in the century following Reconstruction, the Alabama Legislature had purposefully switched from single-member districts to the at-large election of local governments to prevent African-American citizens from electing candidates of their choice, and that the general laws of Alabama governing at-large election systems throughout the state had been manipulated intentionally during the 1950s and 1960s to strengthen their ability to dilute African-American voting strength. The federal court concluded: "From the late 1800's through the present, the state has consistently erected barriers to keep black persons from full and equal participation in the social, economic, and political life of the state." *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1356-60 (M.D. Ala. 1986). Based on these findings, the district court expanded the Dillard litigation to include a defendant class of 19 county commissions, 30 county school boards, and 148 municipalities who were then employing at-large election systems tainted by the racially motivated general laws.

49. Between 1982 and the U.S. Supreme Court's ruling in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), the U.S. Department of Justice objected to forty-eight voting changes in Alabama under Section 5 of the Voting Rights Act as having the purpose or effect of discriminating on the basis of race or color. DOJ, CIVIL RIGHTS DIV., VOTING DETERMINATION LETTERS FOR ALABAMA, https://www.justice.gov/crt/voting-determination-letters-alabama (last updated Aug. 7, 2015).

50. Voting in Alabama is racially polarized.

51. Alabama employs a number of practices and procedures that enhance the opportunity for discrimination against African Americans in the election of appellate judges. The state imposes a majority-vote requirement in primary elections, uses staggered terms and numbered-place requirements that function as anti-single shot provisions, operates elections on an at-large basis, and uses unusually large election districts.

52. As a result of the history of official and private discrimination, African-American residents of Alabama have a lower socioeconomic status and lag behind white residents in a wide range of areas, including employment, income, education, and access to health care.

53. Many effects of discrimination are still disproportionately borne by African-American residents of Alabama today. African-American residents have a poverty rate and an unemployment rate that is more than twice that of white residents. U.S. Census Bureau, *2014 American Community Survey 1-Year Estimates*, tbls. S1701 & S2301. African-American residents are also more than 30 percent more likely than their white counterparts to be without a high school diploma. *Id.* tbls. B15002A & B15002B.

54. African Americans continue to be underrepresented among elected officials in Alabama. None of the current twenty-six statewide elected officials is an African American. As of 2015, African Americans held only 16.7 percent of all elected offices in the State. *Khalilah Brown-Dean*, *et al.*, *50 Years of the Voting Rights Act: The State of Race in Politics*, Joint Center for Political and Economic Studies (2015), *available at* http://jointcenter.org/sites/default/files/VRA%20report%2C%203.5.15%20%281130%20am%29%28updated%29.pdf.

55. From 2000 to present, at least thirteen African-American candidates have run for statewide non-judicial offices. All have been defeated by white candidates.

56. African-American candidates have had more success in localized races, but almost exclusively where the district's voting-age population is majority African-American. For example, there are currently twenty-seven African-American members of the Alabama House of Representatives. Each represents a district that has a majority African-American voting-age population, except for one member whose district is 47 percent African-American. There are currently seven African-American members of the Alabama State Senate. All seven represent districts with a majority African-American voting-age population. One white House member and one white senator are elected from a majority-black district. Only one African American, James Fields of Cullman County, has ever been elected to the Alabama Legislature from a majority-white district, and he was defeated by a white challenger in the next election.

57. The Alabama Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals often render decisions that affect the lives of members of Alabama's African-American community directly, particularly, and significantly. For example, according to the Equal Justice Initiative, "nearly 65% of all murders [in Alabama] involve black victims, yet 80% of the people currently awaiting execution in Alabama were convicted of crimes in which the victims were white. Only 6% of all murders in Alabama involve black defendants and white victims, but over 60% of black death row prisoners have been sentenced for killing someone white." *Death Penalty: Race*, Equal Justice Initiative, *available at* http://www.eji.org/deathpenalty/race. Despite comprising approximately one-quarter of the State's population, "[n]early 63% of the Alabama prison population is black." *Id*.

58. In 2012, the U.S. Supreme Court held that Alabama's practice of issuing mandatory sentences of life in prison without the possibility of parole for juvenile homicide offenders, which disproportionately affected African American children, violated the Eighth

12

Amendment's prohibition on cruel and unusual punishment. *Miller v. Alabama*, 132 S. Ct. 2455 (2012). Before the practice was struck down as unconstitutional, the Alabama Court of Criminal Appeals affirmed the mandatory life without parole sentence and the Alabama Supreme Court refused to review that decision.

59. As a result of the interaction between Alabama's incarceration rate and its felony disenfranchisement law, nearly 15 percent of Alabama's African American voting age population cannot vote. *Christopher Uggen et al.*, *State-Level Estimates of Felon Disenfranchisement in the United States, 2010*, 17 (2012), available at http://www.sentencingproject.org/wp-content/uploads/2016/01/State-Level-Estimates-of-Felon-Disenfranchisement-in-the-United-States-2010.pdf.

## CLAIMS FOR RELIEF

**CLAIM 1: VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965**

60. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 59 above, as if fully set forth herein.

61. Alabama's African-American population is sufficiently numerous and geographically compact to allow for the creation of at least one properly-apportioned, majority-black, constitutional single-member district for electing members to the Supreme Court in a nine-district plan. Alternatively, Alabama's African-American population is sufficiently numerous and geographically compact to allow for the creation of at least one properly-apportioned, majority-black, constitutional single-member district for electing members to the Supreme Court in an eight-district plan. For the Court of Criminal Appeals and Court of Civil Appeals, Alabama's African-American population is sufficiently numerous and geographically compact to

allow for the creation of at least one properly-apportioned, majority-black, constitutional single-member district in a five-district plan.

62. In these remedial districts, the African-American population constitutes a majority of both the total population and the voting-age population. Alabama's African American voters are politically cohesive, and elections for the three courts at issue reflect a clear pattern of racially polarized voting that allows the bloc of white voters usually to defeat the African-American community's preferred candidate.

63. The totality of the circumstances establishes that the use of an at-large method of electing members of the Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals has the effect of denying African-American voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

64. Violations of Section 2 occur with each statewide judicial election. Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals using an unlawful election method.

**CLAIM 2: VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS**

65. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 64 above, as if fully set forth herein.

66. Plaintiffs further allege that the method of electing Alabama's appellate courts is being maintained for the discriminatory purpose of diluting the voting strength of black Alabamians in violation of the Fourteenth and Fifteenth Amendments.

67. A motivating purpose in maintaining the statewide, at-large system for electing judges to Alabama's appellate courts is to limit the opportunity of black Alabamians to participate meaningfully and effectively in the political process to elect judges of their choice.

68. This motivating purpose is illustrated by (a) the persistent advocacy of black Alabama legislators to change the system for electing Alabama's Supreme Court justices from a statewide, at-large system, and (b) the equally persistent and unjustified opposition to this advocacy, by the majority-white Alabama legislators despite knowledge that the current system limited the opportunity of black Alabamians to participate meaningfully and effectively in the political process to elect judges of their choice. For example, after the defeat of the two incumbent African-American justices Ralph Cook and John England, Jr. in 2000, bills to change to district elections for the Alabama Supreme Court were introduced by Black Caucus members in 2001 and 2004, but were defeated by the majority-white Alabama Legislature.

69. That the current system for electing judges to Alabama's appellate courts is maintained, at least in part, by a discriminatory purpose is further supported by the following evidentiary factors set out in *Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (5th Cir. 1973), which are relevant to the question whether the at-large scheme "is being *maintained* for invidious purposes." *Rogers v. Lodge*, 458 U.S. 613, 622 (1982) (emphasis in original).

    a. Blacks have "less opportunity than did other residents in the district to participate in the political processes and to elect" appellate court judges. See ¶¶ 5, 23, 27, 34, 35, 37, 39, 45, 55, 56, and 62 above.

    b. The at-large scheme is "rooted in racial discrimination." See ¶ 47 above.

    c. Increasingly, black Alabamians have less access to the "slating" of candidates. In the past, the "Redeemer" Democratic Party leaders slated

<blockquote>

candidates for the Supreme Court. Today, the Business Council of Alabama exercises nearly exclusive slating power.

</blockquote>

d. "The existence of past discrimination in general precludes the effective participation in the election system." Alabama's past discrimination still depresses the socio-economic status of its black citizens, continues to dominate the election process, and encourages racially polarized voting. See ¶¶ 49-55 above.

e. "The existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts." See ¶¶ 21, 23, 51, 54-55, and 64. In addition, Judge Thompson in *Dillard v. Crenshaw County,* 640 F. Supp. 1347, 1356-57 (M.D. Ala. 1986), held that the numbered-post requirement was enacted for purposefully discriminatory reasons.

# PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

a. Declare that the use of at-large elections to elect judges for the Alabama Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the Constitution of the United States;

b. Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections for the Alabama Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals under the current method of election;

c. Order the implementation of a new method of election for the Alabama Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals that complies with the Fourteenth and Fifteenth Amendments of the Constitution of the United States and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

d. Award plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action, such as expert fees; and

e. Order such additional relief as the interests of justice may require.

Dated:  January 9, 2018                     Respectfully submitted,


By: /s/Richard E. Schwartz
    Richard E. Schwartz (*pro hac vice*)
    rschwartz@crowell.com
    Keith J. Harrison (*pro hac vice*)
    kharrison@crowell.com
    CROWELL & MORING LLP
    1001 Pennsylvania Ave, NW
    Washington, DC 20004
    Telephone: (202) 624-2500
    Facsimile: (202) 628-5116

    Jon Greenbaum (*pro hac vice*)
    jgreenbaum@lawyerscommittee.org
    Ezra D. Rosenberg (*pro hac vice*)
    erosenberg@lawyerscommittee.org
    Brendan B. Downes (*pro hac vice*)
    bdownes@lawyerscommittee.org
    Dorian L. Spence (*pro hac vice*)
    dspence@lawyerscommittee.org
    LAWYERS' COMMITTEE FOR CIVIL
      RIGHTS UNDER LAW
    1401 New York Ave., NW
    Suite 400 Washington, D.C. 20005
    Telephone: (202) 662-8600
    Facsimile: (202) 783-0857

    James U. Blacksher
    Bar No. ASB-2381-S82J
    jblacksher@ns.sympatico.ca
    P.O. Box 636
    Birmingham, AL 35201
    Telephone: (205) 591-7238
    Facsimile: (866) 845-4395

    Edward Still
    Bar. No. ASB-4786-147W
    still@votelaw.com
    429 Green Springs Hwy
    STE 161-304
    Birmingham, AL 35209
    Telephone: (205) 320-2882
    Facsimile: (205) 320-2882

J. Mitch McGuire
Bar No. ASB-83l7-S69M
jmcguire@mandabusinesslaw.com
31 Clayton Street
Montgomery, AL 36104
Telephone: (334) 517-1000
Facsimile: (334) 517-1327

Bradford M. Berry (*pro hac vice*)
bberry@naacpnet.org
Anson Asaka (*pro hac vice*)
aasaka@naacpnet.org
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21205
Telephone: (410) 580-5797
Facsimile: (410) 358-9350

**Certificate of Service**

I certify that on January 9, 2018, I filed the foregoing document electronically via the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Richard E. Schwartz
Richard E. Schwartz (*pro hac vice*)