IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SHERMAN NORFLEET, CLARENCE MUHAMMAD, CURTIS TRAVIS, and JOHN HARRIS, | ) ) ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:16-CV-731-WKW |
| | ) | [WO] |
| STATE OF ALABAMA and JOHN H. MERRILL, in his official capacity as Alabama Secretary of State, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER
## ON DAUBERT MOTIONS

## I. INTRODUCTION

Plaintiffs contend that the State of Alabama's century-and-a-half-old system of conducting at-large elections for Alabama's appellate judges dilutes the voting power of African-Americans in violation of § 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301, and contravenes the prohibitions of racial discrimination in the Fourteenth and Fifteenth Amendments to the United States Constitution, U.S. Const. amends XIV, § 1, XV. They sue the State of Alabama and John H. Merrill, in his official capacity as the Alabama Secretary of State, for

injunctive and declaratory relief and seek a federal court order directing the State to create single-member districts for elections of its appellate judges. This case was tried to the bench over six days in November 2018.

Pending are two motions challenging the admissibility of defense experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993): (1) Plaintiffs' Motion to Exclude Testimony of Dr. Scott W. Gaylord (Doc. # 101); and (2) Plaintiffs' Motion to Exclude Testimony of Christopher Bonneau (Doc. # 100). The court deferred ruling on Plaintiffs' *Daubert* motions until after it heard the challenged experts' trial testimony. (*See* Doc. # 127.) For the reasons to follow, the *Daubert* motions are due to be granted in part and denied in part.

## II. STANDARD OF REVIEW

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and

> (d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 assigns the trial court a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony rests both on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert*, 509 U.S. at 597)). This gatekeeping responsibility is the same when the trial court is considering the admissibility of testimony based upon "'technical' and 'other specialized knowledge.'" *Kumho Tire*, 526 U.S. at 141 (quoting Fed. R. Evid. 702). The court's gatekeeping role under *Daubert* is "even more relaxed in a bench trial situation" because "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1268–69 (11th Cir. 2005).

Considering *Daubert*'s "gatekeeping requirement," the Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

> Trial courts must consider whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). These requirements are known as the "qualifications," "reliability," and "helpfulness" prongs. *See id.*

"The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Id.* And the proponent must meet its burden by a preponderance of the evidence. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." (citing *Daubert*, 509 U.S. at 592 n.10)).

As to qualifications, "experts may be qualified in various ways," including by scientific training, education, and experience. *Frazier*, 387 F.3d at 1260–61. "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012). "If the witness is relying solely or primarily on experience, then the witness must

explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

Courts must also be mindful that "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014). But "[s]o long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility." *Henderson v. Goodyear Dunlop Tires N. Am., Ltd.*, Nos. 3:11-CV-295-WKW, 3:12-CV-510-WKW, 2013 WL 5729377, at *6 (M.D. Ala. Oct. 22, 2013) (quoting *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008)).

As to reliability, trial courts retain "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. The focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. After all, "*Daubert* does not require certainty; it requires only reliability." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1198 n.10 (11th Cir. 2010). But district courts may reject expert testimony that is based on sound

methodology when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Finally, whether the expert testimony will assist the trier of fact in understanding the evidence or a fact in issue "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation and internal quotation marks omitted). Moreover, "[o]nce an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not — in its view — particularly strong or persuasive." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 990 (11th Cir. 2016). Where the basis of expert testimony satisfies Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III. DISCUSSION

### A.    Dr. Gaylord may not offer legal conclusions, but he may opine as an expert on the history and politics of state judicial selection.

Dr. Gaylord is an attorney and law professor who also holds a doctorate in philosophy. He was offered as an expert in the judicial selection process. Trial Tr.

III, at 54–161; Defs.' Trial Exs. 25, 27.[1]  Plaintiffs challenge five different opinions offered by Dr. Gaylord.

First, Plaintiffs seek exclusion of Dr. Gaylord's opinion on the legitimacy of the State's interest in its current judicial selection system because it is a legal opinion.  The court agrees with Plaintiffs.  This portion of Dr. Gaylord's report is a historical and philosophical examination of the separation of powers, judicial independence, and the role those ideas played in motivating states' adopting different models of judicial selection.  This section cites caselaw, Blackstone, Montesquieu, and several secondary sources.  Gaylord Expert Report, at 18–31 (Doc. # 87-1).  While the historical facts surrounding the development of judicial selection methods in the states is a proper subject for an expert opinion, the legitimacy of the state interests involved is not because that is a question of law.  *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 732 (1999) (Scalia, J., concurring) (explaining that "[w]hether the government's asserted basis for its challenged action represents a legitimate state interest" is "a question of law for the court"); *Strickland v. Royal Lubricant Co.*, 911 F. Supp. 1460, 1469 (M.D. Ala. 1995) ("While an expert's legal conclusions are not admissible, an opinion as

---

[1] At trial, Dr. Gaylord's expert reports were admitted as Defendants' Exhibits 25 and 27. The exhibits include the header generated when the reports were filed in the CM/ECF system.  In the CM/ECF system, Exhibit 25 is Document 87-1, and Exhibit 27 is Document 93-2.  Citations in this opinion are to the CM/ECF document and page numbers in the header, and not to the exhibit numbers.

to the *ultimate issue of fact* is admissible . . . ." (emphasis added)). To the extent that Dr. Gaylord's opinion addresses the legitimacy of the state interests promoted by Alabama's judicial selection model, the court will disregard it as a legal opinion. That does not keep the court from reading Dr. Gaylord's sources and drawing conclusions itself, of course.

Second, Plaintiffs seek to exclude Dr. Gaylord's opinion that the State adopted its present system for nondiscriminatory reasons. Gaylord Expert Report, at 28–31 (Doc. # 87-1); Trial Tr. III, at 78–79. However, it is a different kind of question whether Alabama had these interests — linkage, judicial independence, and accountability — in its collective mind when it adopted its present system. This is a matter of historical fact, and a proper subject for expert testimony. Historical matters are not within a witness's "personal knowledge," *see* Fed. R. Evid. 602, nor are they based on his or her "perception," *see* Fed. R. Evid. 701. A witness seeking to offer testimony on facts of history must therefore be qualified as an expert under Rule 702. *See Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F.3d 1279, 1295 (11th Cir. 2012).

The court cannot say that Dr. Gaylord's opinion on Alabama's reasons for adopting its present system is unreliable, or that he is not qualified to give it.

Although all agree that Dr. Gaylord is not a historian, he has done extensive research, writing, and speaking on the issue of the development of judicial selection in the states. And Plaintiffs do not challenge his expertise in that field. *See* Gaylord Expert Report, at 3 (Doc. # 87-1).

Plaintiffs object only that Dr. Gaylord is not qualified to give an historical opinion about the reasons for judicial elections *in Alabama*. This objection falls flat. Since Dr. Gaylord is qualified to give an opinion on the history of judicial selection in the states, it is proper for him to opine that Alabama's move to judicial elections was consistent (or not) with a similar trend across the states. Although not direct evidence of Alabama's motivations in adopting its present system, it is important contextual evidence.

It is also proper for Dr. Gaylord to analyze localized evidence of Alabama's reasons for adopting judicial elections. Dr. Gaylord cites Malcolm McMillan's book *Constitutional Development in Alabama*, which, using primary sources like newspaper articles, explains Alabama's shift in 1868 from legislative appointment to popular elections as caused in part by distrust of the legislature. Trial Tr. III, at 77–78; Gaylord Expert Report, at 26–28 (Doc. # 87-1). He also cites two *New York Times* articles reporting that some delegates at the Alabama Reconstruction Convention proposed an appointment system to exclude African-Americans from judicial office, a proposal that was rejected in the 1868 constitution in favor of

popular elections.  Trial Tr. III, at 114; Gaylord Expert Report, at 28–29 (Doc. # 87-1).  Plaintiffs seek exclusion of Dr. Gaylord's opinion because these sources do not paint a full picture.

Plaintiffs' argument is not persuasive.  Dr. Gaylord's reliance on these sources does not render his opinion unreliable.  Rule 702 does not mandate acceptable kinds of sources for historians to use, and Plaintiffs had the opportunity at trial to test the reliability of Dr. Gaylord's opinion through cross examination.  *See Cottier v. City of Martin*, No. 02-5021-KES, 2004 WL 6036041, at *4 (D.S.D. May 27, 2004) (rejecting argument that historian's reliance on secondary sources presents an insufficient factual basis for an expert opinion).  Moreover, Plaintiffs do not challenge the accuracy of these sources,[2] and one of their own experts concurred that 1868 measures were designed in part to *help* African Americans' chances of getting elected to judicial office.  *See* Norrell Report, at 6–7 (Doc. # 66-1).  But because Dr. Gaylord is not a historian and sources are few and isolated, the court will give this testimony somewhat less weight than that of the experts who are historians.

Third, as for Dr. Gaylord's opinion that Alabama adopted numbered place requirements in 1927 for nondiscriminatory reasons, that opinion will be excluded.  Gaylord Expert Report, at 29–30 (Doc. # 87-1); Trial Tr. III, at 80–81.  It is largely

---

[2] In fact, Plaintiffs' historian Dr. Norrell testified at trial that *Constitutional Development in Alabama* was the definitive source on the subject.  Trial Tr. III, at 177.

based on the Eleventh Circuit's opinion in *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1286 (11th Cir. 1995) (en banc), which explained that Alabama's numbered place system "was promoted by conservative elements within the Democratic Party who felt threatened by victories in the 1926 elections by rival Progressive/Prohibitionist/Ku Klux Klan factions." This is a different case arguably with different evidence.[3] Dr. Gaylord therefore cannot rely on the Eleventh Circuit's findings of fact in *SCLC* (which the court can read for itself). Dr. Gaylord's opinion on Alabama's reasons for adopting numbered place requirements in 1927 is an inadmissible legal opinion.[4]

Fourth, Plaintiffs challenge Dr. Gaylord's opinion that Plaintiffs have failed to identify "a reasonable alternative practice as a benchmark against which to measure the existing voting practice." Gaylord Expert Report, at 32 (Doc. # 87-1 (quoting *Holder v. Hall*, 512 U.S. 874, 880 (1994))); Trial Tr. III, at 96–98. These portions of Dr. Gaylord's report are essentially a legal brief with citations to caselaw and argument. The court can read the cases and record for itself and draw its own

---

[3] Dr. Norrell offered another piece of evidence that he did not have in *Southern Christian Leadership Conference of Alabama v. Evans*, 785 F. Supp. 1469, 1489 (M.D. Ala. 1992): In a December 31, 1961, article columnist Bob Ingram wrote that Act 221 "was aimed at Negroes as much as anything else." Trial Tr. III, at 262 (Norrell); Pls.' Trial Ex. 31.

[4] The court notes, however, that Dr. Norrell's report draws basically the same conclusion as the Eleventh Circuit in *SCLC*. Dr. Norrell states that the 1927 numbered place system was put in place to protect conservative Democratic incumbents against upstart, Klan-backed candidates. *See* Norrell Report, at 17–18 (Doc. # 66-1).

conclusions. The court will therefore exclude Dr. Gaylord's benchmark opinion as a legal opinion.

Fifth and finally, Plaintiffs seek to exclude Dr. Gaylord's opinion that tort reform, not race, led to a political shift on the Alabama Supreme Court from Democrat to Republican. Gaylord Reply Report, at 2–12 (Doc. # 93-2); Trial Tr. III, at 100–04. Plaintiffs emphasize that Dr. Gaylord is not an expert in voter behavior or patterns. But he is an expert in the history and politics of state judicial elections, and the court sees no reason why he cannot opine on national political trends and how those trends may have been reflected in Alabama.

Plaintiffs correctly note that Dr. Gaylord's opinion lacks empirical support, such as polling. But Dr. Gaylord's opinion, insofar as it is accepted by the court, is not an opinion about voter behavior; it is an opinion about the general political climate surrounding judicial elections in Alabama in comparison to nationwide trends. Dr. Gaylord's opinion does not directly explain why voters voted the way they did. But his opinion does help explain why judicial races gained increased attention from voters and interest groups and why spending in those races rose accordingly. And since *all* the circumstances surrounding judicial appellate elections in Alabama are before the court, it is appropriate for the court to consider that opinion.

In sum, Dr. Gaylord's testimony on the history and politics of judicial selection in the United States and in Alabama is reliable; he is qualified to offer it; and it is helpful to the court in its "searching practical evaluation of the 'past and present reality'" of judicial elections in Alabama. *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986) (quoting S. Rep. No. 97-417, at 30 (1982), *as reprinted in* 1982 U.S.C.A.N. 177, 208). But, because Dr. Gaylord is not a historian by trade and because the evidence he cites may not paint a full picture of Alabama's reasons for adopting its present system, the court will assign somewhat less weight to his historical testimony than to that of the experts who are historians. Finally, Dr. Gaylord's opinions on the legitimacy of the State's interests in its current system and the benchmark requirement are legal opinions and will be disregarded.

## B. Dr. Bonneau may opine as an expert on the causes of black electoral defeats in Alabama.

Dr. Bonneau, who has a Ph.D. in political science, is an associate professor of political science at the University of Pittsburgh. Plaintiffs seek to exclude Dr. Bonneau's expert report on racially polarized voting.[5] (Doc. # 100.) They emphasize that Dr. Bonneau is not qualified to do a racial bloc voting analysis because he has never done such an analysis. Moreover, they note that Dr. Bonneau

---

[5] At trial, Dr. Bonneau's report was admitted as Defendants' Exhibit 24. The exhibit includes the header generated when the report was filed in the CM/ECF system. Exhibit 24 is Document 85-1 in the CM/ECF system. Citations in this opinion are to the CM/ECF document and page numbers in the header, and not to the trial exhibit number. Dr. Bonneau also filed a rebuttal expert report (Doc. # 93-1); Defendants do not challenge that report.

does not employ any of the three court-approved methods for analyzing racially polarized voting.

These objections miss the point of the testimony. Dr. Bonneau's report analyzes the *causes* of racially polarized voting, not the *fact* of racially polarized voting. He concludes that the "lack of success of African-American candidates is not because of their race; rather it is because they all run as members of the Democratic Party." Bonneau Report, at 19, ¶ 50 (Doc. # 85-1).

As discussed more fully in the main opinion, the State may present evidence that nonracial reasons drive election results. Dr. Bonneau's report purports to show that partisanship, not race, drives the voting community and leads to black electoral defeats. *See Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (noting that "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates"); *S. Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1293–94 (11th Cir. 1995) (en banc) (affirming district court's finding that "factors other than race, such as party politics . . . were driving the election results"). Whether the role of partisanship is part of the threshold *Gingles* factors for racially polarized voting or the totality-of-circumstances test, it is relevant to a

§ 2 case like this one.[6]  And as Dr. Lisa Handley, who performed Plaintiffs' racial bloc voting analysis, testified at trial that the three court-approved methods for determining the *existence* of racially polarized voting give no information on the *causes* of racially polarized voting.  Trial Tr. II, at 142–143 (Handley); *see also* Trial Tr. II, at 140 (Handley).

Unhelpful language in Dr. Bonneau's report confuses the nature of his testimony.  For example, Dr. Bonneau states that he was retained by Defendants "to ascertain whether there was racial polarization in Alabama's statewide judicial contests," Bonneau Report, at 1 (Doc. # 85-1), and concludes that "the evidence in this case does not reveal evidence of polarized voting," Bonneau Report, at 18–19 (Doc. # 85-1).  But the statistical analyses contained in the report make clear that, by using bivariate correlation, bivariate linear regression, and multivariate regression to measure the relative electoral strength of white candidates and black candidates, Dr. Bonneau is opining that party, not race, leads to the defeat of African-American candidates.  He is not opining that African-American voters do or do not vote cohesively.

Plaintiffs have not argued that Dr. Bonneau, a political scientist, is not qualified to opine on why voters vote the way they do, nor have they argued that his

---

[6] For the reasons discussed in the main opinion, the role of partisanship in black electoral defeats will be addressed as part of the totality-of-circumstances analysis.

statistical methods for analyzing voter behavior are unreliable. Dr. Bonneau's testimony is therefore admissible as an expert opinion on the causes of African-American electoral defeats in Alabama. To the extent that Dr. Bonneau incidentally opines on the *fact* of racially polarized voting, that testimony will be disregarded.

## IV. ORDER

For the foregoing reasons, it is ORDERED as follows:

(1) Plaintiffs' Motion to Exclude Testimony of Dr. Scott W. Gaylord (Doc. # 101) is GRANTED in part and DENIED in part; and

(2) Plaintiffs' Motion to Exclude Testimony of Christopher Bonneau (Doc. # 100) is GRANTED in part and DENIED in part.

DONE this 5th day of February, 2020.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE